**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RELIABLE TRUCKLOAD & BROKERAGE LLC d/b/a HOPPER LOGISTICS | : : : | CASE NO.: 1:23-cv-01293 |
| Plaintiff, | : : | JUDGE DAVID A. RUIZ |
| v. | : : | JURY DEMAND ENDORSED |
| STAAR LOGISTICS, LLC, et al. | : : | HEREON |
| Defendants | : | |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

The Memorandum in Opposition (the "Opposition") filed by Defendant and Counterclaim Plaintiff STAAR Logistics, LLC ("Staar") confirms that summary judgment should be granted in favor of Plaintiff and Counterclaim Defendant Reliable Truckload & Brokerage LLC d/b/a Hopper Logistics ("Reliable") on Staar's sole claim.  Despite being faced with Reliable's motion, the Opposition wholly fails to set forth any facts supporting its alleged oral contract claim.  *BCG Masonic Cleveland, LLC v. Live Nation Entertainment, Inc.*, 570 F.Supp.3d 552, 559 (N.D. Ohio 2021).

This lawsuit arises out of a Motor Contract Carrier and Broker Agreement (the "Agreement").  It is undisputed that the Agreement has been breached.  In fact, it is undisputed that Staar's owner signed the Agreement after speaking with Reliable, Staar was identified as a party to the Agreement, and Staar had complete financial and management control over the only other party to the Agreement, Eastern Environmental Industries, LLC ("Eastern").

1

Staar controlled all activities once the Agreement was signed. Staar admits that it never utilized Eastern employees or equipment to transfer the shipments provided by Reliable. Rather, Staar simply double and triple brokered the shipments and utilized non-identified carriers on each shipment. Incredibly, the bills of lading only identified Staar. The invoices failed to show any brokering relationship or broker fees. Nonetheless, Staar argues that it had a double brokering relationship with Reliable that was never documented in any of the shipments that were tendered by Reliable under the Agreement.

Most importantly, Staar has failed to present any admissible evidence supporting this unlawful contract. Accordingly, because no genuine issues of material fact exist for trial, summary judgment should be entered in favor of Reliable on Staar's breach of contract claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     RELEVANT FACTS

Reliable's Motion sets forth a statement of facts based on the Declaration of Gary Habeeb and the deposition transcripts of Brian Scott and Richard Johnson. The Opposition attempts to dispute only a small portion of Reliable's factual statement. Each of the alleged disputes – and the undisputed facts – are briefly addressed below.

### A.     Reliable Was A Freight Broker Seeking A Hazmat Carrier In 2022 To Provide Services To Reliable's Customers.

The Opposition does not dispute that Reliable was a broker in 2022. (Declaration of Gary Habeeb at 8 (hereinafter "Dec. at __") (attached as Exhibit 1 to Motion)). The Opposition also does not dispute that Reliable had a business opportunity with Siren Trucking LLC ("Siren") to provide trucking services to Siren and some other companies in Pennsylvania that perform work similar to Siren. (Dec. at 5). Finally, the Opposition does not dispute that Reliable was seeking a hazmat certified carrier to handle the Siren hazmat loads. (Dec. at 11).

2

The Opposition verifies that Staar is "not a carrier." (Opposition at 3). In fact, the Opposition verifies that Star "has always been a broker since it was established in 2016." (Opposition at 3). The Opposition never provides any evidence that Reliable was seeking a "double brokering arrangement" with Staar. (Dec. at 34 and Ex. 2).

**B.    <u>Staar Was Operating Eastern In 2022</u>.**

The Opposition concedes that Staar was managing Eastern's operations in 2021 and 2022. (Opposition at 4). The Opposition further confirms that Brian Scott, one of Staar's owners, had authority to sign contracts on behalf of Eastern. (Opposition at 4). The Opposition confirms Scott's deposition testimony:

> Q. Okay. But you had the ability under the memorandum – I mean it sounds like from the memo of understanding that Staar Logistics was operating the business, you managed the business?
>
> A. Yes.

(Deposition of Brian Scott at 35 ("Dep. Scott at __")).

The Opposition does not dispute any of the facts regarding Staar's complete control over Eastern:

- In December of 2021, Eastern had cash flow problems. (Dep. Scott at 18). The cash flow problems were so bad that Eastern had no credit. (Dep. Scott at 52-53);
- Eastern's owner was not present and operating Eastern on a daily basis. (Dep. Scott at 25);
- Staar's operational management included hiring and firing Eastern's employees, taking over Eastern's accounting responsibility, managing and maintaining Eastern's equipment, and being the front face for all of Eastern's customers. (Dep. Scott at 27-28);
- All of Eastern's revenue was controlled by Staar. (Dep. Scott at 37);
- Eastern's mailing address after the Memorandum of Understanding was Staar's business address. (Dep. Scott at 82-83);
- Eastern was shut down in November of 2022 because Eastern owes Staar and related companies over $800,000. (Dep. Scott at 42-43); and
- Eastern was "multiple million dollars in the hole." (Dep. Scott at 30).

3

In fact, Staar's control over Eastern was so complete that Staar's Operations Manager, Richard Johnson, testified that he believed that Eastern was "part of Staar Logistics." (Deposition of Richard Johnson at 9 (hereinafter "Dep. Johnson at __")). Johnson testified that it was his "understanding" that Staar "purchased Eastern." (Dep. Johnson at 9-10); (*see also* Dep. Johnson at 11 ("It was part of the same company, you know, the overall company")).

      **C.**      **Reliable And Staar Entered Into A Carrier Agreement To Provide Hazmat Services To Reliable And Reliable's Customers.**

The Agreement was executed on April 13, 2022. (Dec. at 13 and Ex. 1); (Dep. Scott at78-79 and Ex. 8). It is undisputed that Staar was managing Eastern's operations when the Agreement was signed. (Dep. Scott at Ex. 10).

The facts relating to the Agreement and the breach of the Agreement are not in dispute. (Opposition at 13-16). The Agreement was provided to an Eastern employee by Reliable. (Dep. Scott at 83). Prior to signing, the Eastern employee provided the Agreement to Brian Scott, one of Staar's owners. (Dep. Scott at 83). Scott recalls that he phoned Reliable prior to signing the Agreement. (Dep. Scott at 86-87). During the phone call, Scott testified that he told Reliable that Staar was "basically operating as an agent to manage all the business functions" for Eastern. (Dep. Scott at 101-102). The Agreement was signed right after this phone call. (Dep. Scott at 86-87). The contract was signed "as is" without any revisions. (Dep. Scott at 87).

The Agreement included a Carrier Profile page that was signed by Eastern's employee. (Dec. at Ex. 1, pg. 2). The Profile Sheet requested the carrier name and the entity listed is "Staar Logistics, LLC." (Dec. at Ex. 1, pg. 2); (Dep. Scott at 107). The equipment listed ono the Carrier Profile sheet was Eastern's equipment. (Dep. Scott at 106). However, the Carrier Profile sheet lists 20 available units and Brian Scott admitted that the number provided to Reliable may not be correct. (Dep. Scott at 106). Brian Scott hand wrote Eastern/Staar Logistics in the Agreement

4

several times. (Dep. Scott at 110). Scott signed on behalf of "Eastern/Staar Logistics LLC." (Dep. Scott at Ex. 8, pg. 7). When deposed in this matter, Scott testified that he has no idea why he was marking Eastern/Staar in the Agreement. (Dep. Scott at 110).

**D.      Eastern Never Provided Carrier Services Under The Agreement.**

Relevant to this Motion, paragraph 14 of the Agreement prohibited subcontracting. (Dep. Scott at Ex. 8, pg. 7). Specifically, Paragraph 14 provides: "Carrier expressly agrees that all freight tendered to it by Broker shall be transported on equipment operated only under the authority of Carrier, and that Carrier shall not in any manner, sub-contract, broker, or in any other form arrange for the freight to be transported by a third-party without the prior written consent of Broker." (Dep. Scott at Ex. 8, pg. 7).

The Opposition does not dispute that Eastern never performed any carrier work under the Agreement. (Dep. Scott at 85); (Opposition at 13-16). Rather, as the Opposition concedes, Staar simply brokered out the Reliable work to third party carriers. (Dep. Scott at 90). At times, Staar utilized a second broker. (Dep. Scott at 137). Most importantly, the Opposition does not dispute that Staar was listed as the Carrier on every bill of lading created under the Agreement. (Dep. Johnson at 19); (Dep. Scott at 95 and Ex. 11); (Dec. at 28).

The invoices issued to Reliable only showed Staar as delivering the load. (Dep. Scott at 97-98 and Ex. 11). The invoice also did not disclose either the broker fee being charged by Staar or that a broker was being utilized to ship the freight. (Dep. Scott at 128, 130, and Ex. 11). Finally, the invoice does not identify the actual carrier of the load. (Dep. Johnson at 27).

**E.      The Opposition Provided No Evidence Of An Alleged Oral Contract.**

The Opposition alleges that "[a] jury should find that STAAR Logistics fulfilled all of its obligations to Hopper Logistics." (Opposition at 13). However, the Opposition provides no

5

evidence of any agreement between Staar and Reliable beyond the written Agreement. (Opposition at 13-16). As set forth above, the only evidence relating to any agreement between Staar and Reliable is when Scott phoned Reliable prior to signing the Agreement. (Dep. Scott at 86-87). During the phone call, consistent with the Memorandum of Understanding, Scott testified that he told Reliable that Staar was "basically operating as an agent to manage all the business functions" for Eastern. (Dep. Scott at 101-102). The Agreement was signed right after this phone call. (Dep. Scott at 86-87).

### III. ARGUMENT

#### A. The Opposition Inappropriately Relies On The Pleadings.

Reliable has filed a motion for summary judgment properly supported by a declaration and deposition testimony. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Based on Reliable's Motion, the burden then shifted to Staar to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In this matter, the Opposition repeatedly relies on the pleadings. (Opposition at 2, 3, 13, 14, and 15). Accordingly, this Court should only consider Staar's evidentiary cites when reviewing Reliable's Motion.

#### B. Staar's Breach Of Contract Claim Fail As A Matter Of Law.

The Opposition argues that Staar should not be held to the terms of the Agreement. (Opposition at 2-5). Rather, in conclusory fashion, the Opposition argues that "[a] jury should find that STAAR Logistics fulfilled all of its obligations to Hopper Logistics." (Opposition at 13). The Opposition wholly fails to present any admissible evidence supporting such a claim.

Under Ohio law, Staar must prove four elements to establish a breach of contract: (1) That a contract existed, (2) that Starr fulfilled his obligations, (3) that Reliable failed to fulfill its obligations, and (4) that damages resulted from this failure. *BCG Masonic Cleveland, LLC v. Live Nation Entertainment, Inc.*, 570 F.Supp.3d 552, 559 (N.D. Ohio 2021). Staar argues that the Agreement was not the contract that it is seeking to enforce, but the Opposition wholly fails to present any facts supporting an oral contract between Staar and Reliable.

As set forth above, the only evidence relating to any agreement between Staar and Reliable is when Brian Scott phoned Reliable prior to signing the Agreement. (Dep. Scott at 86-87). During the phone call, consistent with the Memorandum of Understanding, Scott testified that he told Reliable that Staar was "basically operating as an agent to manage all the business functions" for Eastern. (Dep. Scott at 101-102). The Agreement was signed right after this phone call. (Dep. Scott at 86-87). This evidence simply does not support Staar allegation that Staar was not obligated to perform under the Agreement, but rather some alleged oral contract that permitted Staar to act as a double, and even triple, broker.

Moreover, the documents created following the Agreement run directly contrary to Staar's conclusory allegations. The Opposition does not dispute that Staar was listed as the Carrier on every bill of lading created under the Agreement. (Dep. Johnson at 19); (Dep. Scott at 95 and Ex. 11); (Dec. at 28). The invoices issued to Reliable after the loads were delivered also only showed Staar as delivering the load. (Dep. Scott at 97-98 and Ex. 11). Had a double brokering relationship been created through an agreement, the documents for the shipments and payments most certainly would have reflected such an agreement.

Finally, the Opposition does not dispute that federal law strictly prohibits Staar's conduct: "A broker shall not, directly or indirectly, represent its operations to be that of a carrier. Any

7

advertising shall show the broker status of the operation." 49 C.F.R. §371.7(b); *see also Millam v. Northern Freight, LLC*, Case No. 20-=cv-00797-JPG, 2023 WL 423114 *3 (S.D. Ill.. Jan. 26, 2023). In this matter, Staar's double brokering arrangement was conceded by Staar's counsel. (Dec. at Ex. 2). Ohio courts have long held that an illegal contract is void and cannot be enforced. *Hooker v. Depalos*, 28 Ohio St. 251, 255 (1876) ("We maintain the law applicable to contracts entered into for the purpose of doing any act criminal under the statute of the state, to be, that both parties being in *pari delicto*, or *particeps criminis*, the court will not aid either party to undo what has been done under it or recover back money paid in pursuance or furtherance thereof, but will leave them as it finds them"). Accordingly, Plaintiff's alleged oral contract is factually and legally flawed and should be rejected.[1]

### C. Staar Is Signed The Agreement And Is The Alter Ego Of Eastern.

Finally, the evidence shows that the only contract between Staar and Reliable is the Agreement. The only verbal discussion between Reliable and Staar on the Agreement occurred immediately prior to the execution of the Agreement. (Dep. Scott at 86-87). During the phone call, Scott testified that he told Reliable that Staar was "basically operating as an agent to manage all the business functions" for Eastern. (Dep. Scott at 101-102). The Agreement was signed right after this phone call. (Dep. Scott at 86-87). Scott signed on behalf of "Eastern/Staar Logistics LLC." (Dep. Scott at Ex. 8, pg. 7).

Despite these facts, Staar is asking this Court to ignore Scott's phone call and signature and permit Staar to circumvent the Agreement that Scott signed. The evidence in this case provides that Staar either signed the Agreement or is bound by it due to the alter ego theory. *Servo Kinetics,*

---

[1] Staar also cannot prove damages based on TAB Bank's payments. (Dep. Scott at 73). Staar has filed an improper affidavit seeking to change this testimony. Reliable is filing a motion to strike the affidavit of Crystal Neill.

*Inc. v. Tokyo Precision Instruments Co., LTD*, 475 F.3d 783, 798-799 (6th Cir. 2007). In *Southeast Texas Inns, Inc. v. Priime Hospitality Corp.*, 462 F.3d 666 (6th Cir. 2006), the Sixth Circuit conducted an extensive analysis of when the corporate veil can be breached to hold another party liable for the breach of contract of another. *Id.* at 675. The Court found that three factors are relevant: (1) complete dominion and control; (2) fraud or injustice; and (3) inadequate capitalization. *Id.*; *see also Longo Construction, Inc. v. ASAP Technical Services, Inc.*, 140 Ohio App.3d 665, 670-671 (Cuyahoga Co. 2000) (applying Ohio law to an alter ego analysis).

The Opposition does not challenge the factual basis for the alter ego theory. As set forth above, the Opposition does not dispute that Eastern had cash flow problems and contracted with Staar to operate the company. (Dep. Scott at 18). Staar admits that the cash flow problems were so significant that Eastern had no credit and was millions of dollars in the hole. (Dep. Scott at 30 and 52-53). Staar claims that Eastern was shut down in November of 2022 because Eastern owes Staar and related companies over $800,000. (Dep. Scott at 42-43). Accordingly, inadequate capitalization is unquestionably proven.

As to control, Staar's control over Eastern was so complete that Staar's Operations Manager, Richard Johnson, testified that he believed that Eastern was "part of Staar Logistics." (Dep. Johnson at 9). Johnson testified that it was his "understanding" that Staar "purchased Eastern." (Dep. Johnson at 9-10); (*see also* Dep. Johnson at 11 ("It was part of the same company, you know, the overall company")).

Once the Memorandum of Understanding was signed, Staar learned that Eastern's equipment, including its trucks, were in very poor shape. (Dep. Scott at 48-49). No new trucks were purchased. (Dep. Scott at 46). Rather, Staar claims that it spent hundreds of thousands of dollars to toy to make Eastern's equipment "roadworthy." (Dep. Scott at 41). The equipment was

9

so bad that Staar would only utilize Eastern trucks on local shipments because it was fearful that the equipment would break down too far from Staar's offices. (Dep. Scott at 54). Accordingly, complete dominion and control has also been proven.

Finally, as to fraud and injustice, the Agreement prohibited subcontracting. Staar's owner advised Reliable that Staar was "basically operating as an agent to manage all the business functions" for Eastern. (Dep. Scott at 101-102). The Agreement was signed right after this phone call. (Dep. Scott at 86-87). Following the phone call, the Bills of Lading stated that Staar was the carrier and Staar never objected. (Dep. Scott at Ex. 11). Similarly, the invoices did not reflect the broker relationship or the broker fee. (Dep. Scott at Ex. 11). Staar even filed a lawsuit based on the fraudulent bills of lading. Put simply, Reliable has proven fraud and injustice. Accordingly, Staar should be held to the Agreement whether or not this Court finds that Staar signed the Agreement.

## IV. **CONCLUSION**

Based on the above-cited arguments and authorities, summary judgment should be granted in favor of Reliable on the sole claim asserted by Staar. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Respectfully submitted,

*/s/ David A. Campbell*
David A. Campbell (0066494)
Gordon Rees Scully Mansukhani, LLP
600 Superior Ave., East, Suite 1300
Cleveland, OH 44114
Phone: (216) 302-2531
Fax: (216) 539-0026
dcampbell@grsm.com

*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of September, 2024, the foregoing was filed through the Court's CM/ECF electronic filing system. A copy of this filing will be sent to all parties through the court's ECF system.

                                              */s/ David A. Campbell*
                                              David A. Campbell (0066494)
                                              *Attorney for Defendant*