**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| RELIABLE TRUCKLOAD & BROKERAGE LLC d/b/a HOPPER LOGISTICS Plaintiff, v. STAAR LOGISTICS, LLC, *et al*., Defendants. | CASE NO. 1:23-cv-01293 JUDGE DAVID A. RUIZ **MEMORANDUM OPINION AND ORDER** |

This matter is before the Court upon Plaintiff/Counterclaim Defendant Reliable Truckload & Brokerage LLC d/b/a Hopper Logistics 's Motion for Summary Judgment. (R. 36). Plaintiff Reliable Truckload & Brokerage LLC's (hereafter "Plaintiff" or "Reliable") motion seeks summary judgment on the sole counterclaim asserted by Defendant Staar Logistics, LLC (hereafter "Defendant" or "Staar").

**I. Procedural Background**

On May 19, 2023, Plaintiff filed a four-count civil complaint in the Cuyahoga County Court of Common Pleas against multiple Defendants, including Staar, alleging the following causes of action: (1) breach of contract against all Defendants: (2) fraudulent inducement against Defendant Staar; (3) fraudulent conduct against all Defendants; and (4) tortious interference with a contractual relationship against all Defendants. (R. 1-2). Defendant Staar filed its Answer and Counterclaim on July 28, 2023, alleging a single

1

counterclaim for breach of contract against Reliable. (R. 7).[1]

Now pending is Plaintiff's Motion for Summary Judgment on Defendant Staar's Counterclaim. (R. 36). Staar filed an opposition brief (R. 37), and Plaintiff filed a reply in support of its motion. (R. 39). Defendant Staar was granted leave to file a sur-reply. (R. 39).

## II. Factual Background

According to the Declaration of Gary Habeeb, the Chief Experience Officer and owner of Plaintiff, Reliable is a broker in the trucking industry—entities that do *not* employ drivers or own equipment, but instead assist shippers in finding suitable carriers. (R. 36-1, Habeeb Dec ¶ 8). According to the President of Defendant Staar Logistics, Brian Scott, Defendant Staar has also always been a broker and never employed drivers. (R. 36-2, Scott Depo. at 11).[2]

In December 2021, the owner of Eastern Environmental Industries, LLC ("Eastern") contacted Staar to help manage his company. (R. 37-3, PageID# 688, Scott Depo at 26). At the time, Eastern had problems with cash flow and no credit with local garages. (R. 36-2, PageID# 385, 401-402, Scott Depo. at 18, 52-53). On January 17, 2022, Staar entered into a Memorandum of Understanding (the "MOU") to provide management services to Eastern. (R. 36-2, Scott Dep. Exh. 10, PageID# 442-45). Staar's operational management included the hiring and firing of Eastern employees, responsibility for Eastern's accounting, management of Eastern's equipment, and that Staar "would be the front facing company to the customers." (R. 36-2, PageID# 390-391, Scott Depo. at 27-28). Scott, one of Staar's owners, would sign contracts on Eastern's behalf. (R. 37-3, PageID# 693, Scott Depo. at

---

[1] On August 17, 2023, pursuant to a Joint Proposed Stipulation of Dismissal with Prejudice, Defendant Kodiak Transportation, LLC was dismissed from this action. (R. 12).
[2] Plaintiff and Defendant each separately cite incomplete portions of Scott's deposition.

57).

In April of 2022, Reliable was a broker, but entered into a Contractor's Operating Agreement ("COA") with a third-party, Siren Trucking, LLC, who was seeking a carrier to transport hazmat-certified loads. (R. 36-1, PageID# 365-66, Habeeb Decl. at ¶¶ 5-6, 8-11). The COA ostensibly "provided that Reliable would be one of Siren's primary hazmat carriers once Reliable became hazmat certified as a carrier," "Reliable worked throughout 2022 to become a hazmat certified carrier," and "[u]ntil Reliable was a hazmat certified carrier, Reliable sought out a hazmat certified carrier to handle the Siren hazmat loads." *Id*. at PageID# 376, ¶¶ 9-11. Reliable specifically sought out Eastern on the recommendation of one of its own officers due to familiarity with an Eastern employee, Ray Kratz. *Id.* at PageID# 367, ¶12. On April 13, 2022, Kratz brought a Motor Carrier and Broker Agreement (the "Written Agreement") to Brian Scott to sign. (R. 36-2, PageID# 439-441, Exh. 8; R. 36-2, PageID# 414, Scott Depo. at 83).

During his deposition, Scott stated that he called Drew Gray at Reliable before signing the Written Agreement, and explained to him the relationship between Staar and Eastern, informing him that Staar was acting as the managing agent of Eastern. (R. 36-2 & R. 37-3, PageID# 415, 697, Scott Depo. at 80-81, 85; R. 37-2, PageID# 681-682, Habeeb Depo. at 34-35). During the discussion, Scott avers that he pointed out to Reliable that Eastern could not perform parts of the Written Agreement that would take them outside Pennsylvania. (R. 36-2, PageID# 415, Scott Depo. at 85). In apparent reference to this phone call, Scott submitted an affidavit wherein he states that "[i]n April of 2022, Andrew Gray and I reached a verbal agreement between STAAR Logistics and Hopper Logistics." (R. 39-3, PageID# 746). In this alleged oral agreement, Staar agreed to co-broker loads for

3

Reliable's customers. (R. 39-3, Scott Decl. at ¶¶ 13-18). When asked during his deposition whether he revised or amended the written contract in any way before signing it, Scott admits he signed the agreement "as is" at Gray's request. (R. 36-2, PageID# 417, Scott Depo. at 87). The parties to the Written Agreement read as follows:

**Hopper Logistics**
8500 Clinton Rd., Brooklyn, OH 44144
MOTOR CONTRACT CARRIER AND BROKER AGREEMENT
This AGREEMENT made the __13__ day of __April__ 20__22__ by and between __Eastern Environmental Ind. LLC__, an Interstate Commerce Commission (ICC) authorized MOTOR CONTRACT CARRIER licensed under permit No. MC__894587__ SUB___, hereinafter referred to as "CARRIER," AND Hopper Logistics, a Federal Highway Administration authorized property broker under license number MC# 1137137, hereinafter referred to as "BROKER."
1 BROKER agrees to offer for shipment and CARRIER agrees to transport in its own equipment, quantities of freight agreed to by both CARRIER and BROKER

(R. 36-1, Habeeb Decl. Exh. 1, PageID #376-78). In apparent contrast to the verbal agreement, the Written Agreement contains a provision that prohibits subcontracting or allowing other motor carriers to transport shipments without Reliable's consent. (R. 36-2, Scott Depo. Exh. 2, PageID # 441). Additionally, the cover sheet accompanying the written agreement states that Reliable (*i.e.* Hopper) "will not accept any edits or changes to our contract." *Id.* at PageID #435. Brian Scott executed the Written Agreement in the following manner:

IN WITNESS WHEREOF, the parties have executed this Contract at the date and place first set forth above

CARRIER __Eastern / Staar Logistics LLC__
BY: (Authorized Signature) __[signature]__
(Please Print Name & TITLE) __Brian J Scott__
Date. __4/13/22__

(R. 36-2, PageID #441).

Following execution of the Written Agreement, Staar introduced former Defendant Kodiak, a carrier, to Plaintiff Reliable's customers, including Siren Trucking LLC, and began providing services to them. (R. 37-3, PageID# 699, Scott Depo. at 138; R. 39-3, Scott Dec. ¶ 18). Though the Written Agreement specified that Eastern would serve as carrier,[3] Defendant's Answer states that Eastern did not transport any hazardous material loads for Plaintiff. (R. 7, PageID# 67, ¶40). Instead, Staar arranged for third-party carriers to perform the shipments for Reliable's customers. (R. 39-3, Scott Decl. ¶¶ 18-19). Staar maintains that Plaintiff "was aware of and consented to the arrangements STAAR Logistics made with Fastrack and the co-brokering arrangements with Kodiak for the pickup and delivery of Hopper Logistics' loads." *Id*. at ¶20.

Richard Johnson, Staar's operations manager, testified that the Bills of Lading listed Staar as the carrier, despite the fact that none of the actual drivers were Staar employees. (R. 36-3, Johnson Depo. at 6, 14, 17-18, 20-22). Staar issued invoices to Reliable that likewise did not reflect the involvement of subcontracted carriers or brokers, and which directed payments to "TAB Bank." (R. 36-2, Scott Depo., 72:7-73:12; *see e.g.* R. 36-2, Scott Depo. Exh. 11, PageID # 446). According to Scott, for several months, Reliable paid these invoices on time, in full, and without issue, (R. 39-3, PageID# 757, Scott Decl. ¶23). Staar contends that Reliable knew it was co-brokering with Staar, as Reliable (1) "knew the name of the trucking company;" (2) "knew that Kodiak had to send one of its own employees down to Texas to get certified;" (3) that reliable "actually put Samsara sensors on the trucking company's truck," and (4) Drew Gray of Reliable "talked to the owners of the broker, the

---

[3] The Written Agreement states that: "CARRIER, without the prior written consent of BROKER, shall not cause or permit any shipment tendered hereunder to be brokered to or transported by any other motor carrier." (R. 36-2, PageID# 440, Exh. 8 at 7, ¶6).

company that Kodiak was using." (R. 37-3, PageID# 699, Scott Depo. at 138-139).

According to Reliable's CEO Gary Habeeb, in late 2022, the company started suspecting that neither Staar nor Eastern were actually carrying the loads. (R. 36-1, PageID# 369, Habeeb Decl. at ¶¶29-33). Habeeb avers that Reliable then requested verification from Staar that it was complying with the Written Agreement, but asserts Staar never provided the requested information. *Id*. Reliable began to withhold payments for services rendered between August 16, 2022 and January 17, 2023. (R. 39-3, PageID# 747, Scott Decl. ¶ 26). Reliable took the position that the arrangement with Staar constituted "an unlawful double brokering arrangement." (R. 36-1, PageID# 369, Habeeb Decl. ¶34). Staar responded by sending a demand letter and pursuing payment by filing lawsuits against some of Reliable's customers. (*Id.* at ¶¶ 34-35; R. 36-1, Habeeb Decl. Ex. 2, PageID # 380).

### III. Legal Standard

Summary judgment is appropriate only if the moving party demonstrates there is no genuine dispute of material fact on an issue that would entitle the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the non-movant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is only genuine, however, if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

IV. Discussion

Reliable raises four alternative arguments in support of its motion for summary judgment on the counterclaim. The first—that Staar became a party to the Written Agreement by signing it—is plainly disputed and therefore unsuited for resolution at the summary judgment stage. (R. 36, PageID# 354-355, 359-362). Staar asserts that it signed only as the agent of Eastern, that Staar was not a party to that agreement, and that the agency relationship was explained to Drew Gray of Reliable before the Written Agreement was signed. (R. 37-3, PageID# 698, Scott Depo. at 110-111; R. 39-3, PageID# 745, Scott Decl. at ¶¶7-14). As stated above, the Court must make all reasonable inferences and construe the evidence in the light most favorable to Staar as the nonmovant. Furthermore, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and not those for the court to resolve on a motion for summary judgment. *Anderson*, 477 U.S. at 255. Given the conflicting evidence, the Court cannot find, as a matter of law, that Staar was a party to the Written Agreement.

Turning to the remaining three arguments, Reliable contends the following: (1) Staar and Eastern are "alter egos" and thus precluded by the Written Agreement's merger clause from asserting a separate Verbal Agreement; (2) the Verbal Agreement is void as an illegal double-brokering arrangement; and (3) the Verbal Agreement was not formed, but if it was, Staar cannot show damages arising from its breach. Each of these arguments is addressed in turn below. (R. 36, PageID# 359-363).

A. Alter Ego Theory

In the interest of equity, a court may pierce the corporate veil—that is, impose liability on a controlling entity for the conduct of another—in limited circumstances. Under

Ohio law, veil piercing is permitted when: "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own; (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Transition Healthcare Assocs. v, Tri-State Health Investors, LLC*, 306 Fed. App'x 273, 280 (6th Cir. 2009) (quoting *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1086, as modified by *Dombroski v. Wellpoint, Inc.*, 895 N.E.2d 538 (Ohio 2008)); *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007) ("A parent corporation is generally not liable for the acts of its subsidiary, even if its subsidiary is wholly owned. However, in extraordinary cases… courts will pierce the corporate veil[.]").

When considering the first prong of the *Belvedere* test, Ohio courts typically examine a number of factors to determine whether the "complete control" prong of the veil-piercing test is satisfied. As the Sixth Circuit explained:

> To determine whether the first prong of this test has been satisfied, Ohio courts often consider a variety of factors: (a) grossly inadequate capitalization; (b) failure to observe corporate formalities; (c) insolvency of the debtor corporation at the time the debt was incurred; (d) the parent holding itself out as personally liable for certain subsidiary obligations; (e) diversion of funds or other property of the subsidiary for the parent's use; (f) the absence of corporate records; and (g) the fact that the subsidiary was a mere facade for the operations of the parent.

*Corrigan*, 478 F.3d at 724 (citing *LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 602 N.E.2d 685, 687–88 (Ohio Ct. App. 1991). In a Sixth Circuit decision, applying similar Kentucky law principles concerning piercing the corporate veil, the Court of Appeals found complete control was lacking where the plaintiff failed to present evidence that the entity to

8

be pierced was not financially independent of the other entity. *Mattingly v. R.J. Corman R.R. Grp., LLC*, 90 F.4th 478, 488 (6th Cir. 2024) (citing *Inter-Tel Techs, Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 164 (Ky. 2012).[4] "[C]onsideration of the adequacy of capitalization concerns the initial financing of the corporation, not its condition at the time of the events complained of or thereafter. Subsequent economic developments that weaken the debtor's financial condition, even those leading to insolvency, are irrelevant for this purpose if the corporation was adequately financed at the outset." *Inter-Tel Techs, Inc.*, 360 S.W.3d at 167.

Herein, factual issues abound. It is unclear whether Staar has any ownership interest in Eastern whatsoever. It is true that Reliable's CEO swore in his affidavit that Reliable "learned" that Staar "owned and operated Eastern." (R. 36-1, PageID# 367, Habeeb Decl. at ¶13). Also, Staar's operations manager, Johnson, testified that it was his "understanding … that STAAR Logistics purchased Eastern." (R. 36-3, PageID# 634, Johnson Depo. at 109).

Nevertheless, neither Johnson's "understanding" nor Reliable CEO's vague assertion that he "learned" Staar owned Reliable show any foundation for their beliefs and do not appear to be based on actual personal knowledge. Affidavits offered in support of or opposition to summary judgment must be based on personal knowledge and must be admissible as evidence; and, in addition, must show affirmatively "that the affiant ... is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(c)(4). Put another way, "evidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence ... must be disregarded." *Alpert v. United States*, 481 F.3d 404, 409 (6th

---

[4] The Kentucky Supreme Court observed that "the most critical factors" include "grossly inadequate capitalization, egregious failure to observe legal formalities… and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Inter-Tel Techs, Inc,* 360 S.W.3d at 164 (citations omitted).

9

Cir. 2007) (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)).

Even assuming *arguendo* that the above evidence was appropriate to consider at the summary judgment stage, Staar's president, Scott, testified that Staar never purchased Eastern nor had any ownership interest in Eastern. (R. 37-4, PageID# 701, Scott Decl. at ¶¶ 5-6; R. 36-2, PageID# 444, Scott Depo. Exh. 10 at ¶8). While acknowledging that the Memorandum of Understanding provided Staar with an option to purchase Eastern, Scott has stated that Staar never exercised that option. *Id*. It would be inappropriate for the Court to find at this stage of the proceedings that Staar owned Eastern, as such a finding would necessarily entail a forbidden credibility determination. Absent any ownership, it is difficult to contemplate how the alter ego doctrine would even apply. The Court agrees with Staar that Ohio law concerning piercing the corporate veil applies in the parent-subsidiary context, or involves the shareholders and/or officers of a corporation in order to deny the corporate shield to wrongdoing owners. Absent indisputable evidence of ownership, the Court cannot pierce the corporate veil at this stage of the proceedings.

Moreover, as explained below, even assuming *arguendo* that Staar had some ownership interest in Eastern, Reliable still has not met its burden, as genuine issues of material fact exist concerning the control and fraudulent conduct prongs.

**1. Reliable Has Not Shown Complete Control as a Matter of Law**

In support of its alter ego argument, Reliable contends that Staar exercised complete control over Eastern, and points to Eastern's financial woes as evidence of inadequate capitalization. (R. 36, PageID# 360). As stated above, the adequacy of capitalization concerns the *initial* financing of the corporation, not subsequent economic developments

10

that could reduce a company's financial condition and even leading to insolvency. *Inter-Tel Techs, Inc.*, 360 S.W.3d at 167. Plaintiff provides no evidence to support that Eastern was inadequately capitalized *ab initio*. Further, Plaintiff cites no authority suggesting that a company's financial woes, even if extreme, constitute inadequate capitalization for purposes of determining whether the corporate veil should be pierced. Eastern's debt, credit and cash flow problems are, therefore, not particularly relevant to the control analysis. Further, the MOU appears to be an arm's length transaction between two separate entities, that did not create any ownership interest. (R. 36-2, PageID# 442, Scott Depo. Exh. 10 at ¶8). Thus, there is no indication that corporate formalities were cast aside.

Plaintiff also asserts that Staar's extensive control over Eastern's operations is further evidence of complete dominion and control. (R. 36, PageID# 360-361). Indeed, there is uncontroverted evidence in the record that Eastern yielded significant day-to-day operational control over to Staar. For example, Staar had hiring and firing power over Eastern employees, and managed Eastern equipment. (R. 36-2, PageID# 390, Scott Depo. at 27-28). But Plaintiff cites no authority suggesting that this level of operational involvement, on its own, is sufficient to establish the *Belvedere* complete control prong. (R. 36, PageID# 360-361). If it were, all management companies running the day-to-day operations of another entity would be subject to veil-piercing.

**2. Reliable Has Not Established Fraud or Any Comparable Misconduct**

The Ohio Supreme Court modified the second prong of the *Belvedere* test, limited initially to fraud and illegal acts, to include "similarly unlawful acts" by shareholders abusing the corporate form. *Dombroski*, 895 N.E.2d at 545. The Ohio Supreme Court, mindful of opening too many cases to veil piercing, limited its expanded test to "egregious wrongs … committed by shareholders" that are "as objectionable as fraud or illegality." *Id*.

11

at 545. However, even a "straightforward tort, a basic example of unjust conduct … does not represent the type of exceptional wrong that piercing is designed to remedy." *Id.* at 545.

To establish the second *Belvedere* prong, Plaintiff relies on Scott's representation at the signing of the Written Agreement that Staar was "basically operating as an agent to manage all the business functions" for Eastern. (R. 36, PageID# 361, citing R. 36-2, PageID# 424, Scott Depo. at 101-102). Without more, Staar acting as an agent for Eastern is irrelevant. Absent a compelling factual presentation of fraud or an illegal act, this is insufficient.

Plaintiff additionally relies upon the Bills of Lading, which listed Staar as the carrier, despite the shipments actually being performed by third-party entities. (R. 36, PageID# 361, citing R. 36-2, PageID# 447, Scott Depo. Exh. 11). While the Bills of Lading are inaccurate, the Court deems this insufficient. The Court cannot disregard Staar's consistent position that Reliable was aware of its co-brokering role from the outset. Scott testified that he spoke directly with Andrew Gray before signing the Written Agreement, explaining Eastern's operational limitations and offering Staar's assistance in coordinating shipments. (R. 36-2, PageID# 415 and R. 37-2, PageID# 698, Scott Depo. at 85, 112) ("before we signed [the Written Agreement], I explained to Mr. Gray, Drew Gray, that if this can't go on Eastern's equipment, the only way we can help him is by brokering either to Fastrak or to Kodiak or an outside carrier.") This testimony, which a finder of fact is free to disregard cannot be ignored by the Court, as it creates a disputed issue of material fact with respect to Plaintiff's fraud allegations.

The Sixth Circuit addressed a similar claim to the case at bar in *Henceroth v. Chesapeake Expl., LLC*, 814 Fed. App'x 67 (6th Cir. 2020). Therein, Chesapeake Operating,

pursuant to an agency agreement between the two entities, "handle[d] Chesapeake Exploration's day-to-day activities, including collecting payments and disbursing royalties" but the court found no reason to pierce the corporate veil as the complaint was bereft of any allegations of fraud, an illegal act, or a similarly unlawful act. *Id*. at 72. Although the Complaint herein is replete with rather conclusory allegations of "fraudulent conduct" (R. 1-2), this case has been the subject of significant discovery and the evidence concerning fraud or fraud in the inducement is not straightforward. As in *Henceroth*, this action "raises a run-of-the-well claim of breach of contract." 814 Fed. App'x at 72. To the extent Plaintiff maintains that Staar fraudulently represented its capabilities regarding the carrying of hazardous cargo, there is conflicting testimony, including Scott's aforementioned deposition testimony that plainly states he explained to Plaintiff that Staar was a broker and not a carrier. The Court, at this stage, must make all factual inferences in favor of Staar as the non-moving party.

**B. The Alleged Verbal Agreement Does Not Fail as a Matter of Law**

Under Ohio law, the elements for a breach of contract claim are as follows: "plaintiff must demonstrate by a preponderance of the evidence (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant failed to fulfill his obligations, and (4) that damages resulted from this failure." *Williams v. Richland Cty. Children Servs.*, 861 F. Supp. 2d 874, 885 (N.D. Ohio 2011) (citing *Telxon Corp. v. Smart Media of Delaware, Inc.*, Case Nos. 22098, 22099, 2005 Ohio 4931, 2005 WL 2292800, at *20 (Ohio App. 9 Dist. Sept. 21, 2005)); *accord BCG Masonic Cleveland, LLC v. Live Nation Entertainment, Inc.*, 570 F.Supp.3d 552, 559 (N.D. Ohio Nov. 5, 2021).

Plaintiff maintains that Staar engaged in double-brokering, a practice that Plaintiff maintains is prohibited by federal law. (R. 36, PageID# 363, citing 49 C.F.R. §371.7(b) and

13

*Millam v. N. Freight, LLC*, 2023 WL 423114, at *3 (S.D. Ill. Jan. 26, 2023)).

>     According to the *Millam* court:
>
> Double brokering involves the practice of a broker receiving a shipment from a shipper and subsequently tendering the shipment to another broker for movement by a motor carrier. It is frequently done without the shipper's knowledge or the motor carrier's knowledge. No written or even oral contracts exist between the shipper and the second broker or between the motor carrier ultimately used and the initial broker.

*Millam*, 2023 U.S. Dist. LEXIS 13680 at *7 (citing *Jets Prolink Cargo, Inc. v. Brenny Transp., Inc.*, No. Civ. 02-1294, 2003 U.S. Dist. LEXIS 15092, 2003 WL 22047910 at *1, n.1 (D. Minn. Aug. 29, 2003)). Reliable does not cite any statute that explicitly prohibits double brokering. Plaintiff's sole case law from the Southern District of Illinois cites a law journal that states "While there do not appear to be any reported administrative or court decisions that deal with this precise issue, double brokering is often considered illegal in light of the wording of federal regulations." *Millam*, 2023 U.S. Dist. LEXIS 13680 at *7 (*quoting* James C. Hardman, Third Party Contract Issues Concerning Motor Carriers, Brokers, and Shippers, 34 Transp. L.J. 307, 310 (2007) (citing 49 C.F.R. § 371.7 (2007)).

The cited regulation states that "[a] broker shall not, directly or indirectly, represent its operations to be that of a carrier. Any advertising shall show the broker status of the operation." 49 C.F.R. §371.7(b). This regulation does not aid Plaintiff. Credible or not, there is evidence in the record that Staar disclosed it was not a carrier to Plaintiff. If Staar misrepresented the abilities of Eastern as a carrier, that does not implicate this regulation. Even the *Millam* decision expressly stated that "[t]his Court offers no opinion or finding as to the legality or illegality of double brokering." *Id*. Following that court's lead, this Court likewise makes no such finding. Acting under the hypothetical assumption that double brokering *is* illegal, there is evidence in the record that Reliable knew it was entering into

14

such an arrangement—illegal or not. Further, if Reliable knew that Staar was a broker and not a carrier, it is questionable whether it constitutes double-brokering. As stated above, Scott testified during his deposition that Reliable knew it was co-brokering with Staar, as Reliable (1) "knew the name of the trucking company;" (2) "knew that Kodiak had to send one of its own employees down to Texas to get certified; (3) that Reliable "actually put Samsara sensors on the trucking company's truck," and (4) Drew Gray of Reliable "talked to the owners of the broker, the company that Kodiak was using." (R. 37-3, PageID# 699, Scott Depo. at 138-139).

Under Ohio law, "all contracts which provide that anything shall be done which is distinctly prohibited by law… are void." *Hooker v. De Palos*, 28 Ohio St. 251, 259 (1876). "Prohibited by law" in this instance means "any act criminal under the statute of the state." *Id.* at 255. To the extent Plaintiff is asserting that the Verbal Agreement is void as a matter of law, such an argument not well taken. Plaintiff has failed to set forth clear authority that the arrangement contemplated by the so-called Verbal Agreement are, in fact, illegal.

C. **Breach of a Verbal Agreement**

Plaintiff also argues that, in addition, Staar cannot prove that it fulfilled its obligations under the Verbal Agreement. (R. 36, PageID# 362). Plaintiff does not meaningfully develop this argument, however. Instead, Plaintiff quotes language from the Written Agreement stating that "Carrier expressly agrees that all freight tendered to it by Broker shall be transported on equipment operated only under the authority of Carrier, and that Carrier shall not in any manner, sub-contract, broker, or in any other form arrange, for the freight to be transported by a third-party without the prior written consent of Broker." (R. 36, PageID# 362-363).

Plaintiff's argument misses the boat. Staar has alleged the existence of a Verbal

15

Agreement separate and distinct from the Written Agreement. Failure to comply with the requirements of the Written Agreement does not establish a failure to fulfill obligations under the alleged Verbal Agreement. Plaintiff has not moved for affirmative summary judgment on its own breach of contract claim, and appears to be conflating it with the counterclaim. Furthermore, it appears that a number of loads were delivered, and that Staar arranged for these deliveries even if it did not carry them out, as it is undisputed they are not a carrier. Indeed, Reliable appears to have paid for a number of the deliveries. Arguably, Staar performed under the alleged Verbal Agreement when it arranged for transportation of hazardous loads for Reliable's customers. (R. 39-3, PageID# 746, Scott Decl. ¶¶ 18-19). Again, the Court cannot simply disbelieve Scott's sworn affidavit. That same affidavit states that for several months, Reliable paid invoices for these services on time, in full, and without issue, (R. 39-3, PageID# 757, Scott Decl. ¶23). Likewise, Reliable has admitted that "the loads at issue [as raised before the Pennsylvania court] were successfully transported and Siren paid Hopper [i.e. Reliable] all associated costs, in full." (R. 37-6, PageID# 718, Exh. F; R. 37-7, PageID# 721, Reliable's Answer to Siren's Cross-Claim in Pennsylvania Court at ¶5, Exh. G).[5] Thus, it appears that Reliable may have accepted the value of the performance rendered by Staar, taking payment in full from its customer Siren for the shipments brokered by Staar, even after it ceased paying Staar's invoices.

The Court is mindful that Reliable disclaims that there ever was a Verbal Agreement. Though it may be a mixed question of fact and law, there are facts in the record that, if accepted as true, could support a finding that a Verbal Agreement existed. Given the above

---

[5] These documents arose in connection with an action in the Court of Common Pleas in Jefferson, County, Pennsylvania, where Staar initiated an action against Reliable, and Reliable's customer, Siren, initiated a cross-claim against Reliable. (R. 37-6 & R. 37-7).

16

evidence concerning deliveries and payments by both Reliable and its customer Siren, Plaintiff's argument—that Staar cannot prove that it fulfilled its obligations—is not well taken.

### D. Alleged Lack of Financial Harm

Finally, Plaintiff advanced an undeveloped argument that Staar cannot prove damages. (R. 36, PageID# 362). Plaintiff points out that Staar's invoices directed payment to a third party bank, TAB Bank, as Staar used TAB Bank to factor its account receivables. (R. 36, PageID# 362, citing R. 36-2, PageID# 407, Scott Depo. at 72-73). When Staar issued invoices, TAB Bank would advance 90 to 95 percent of those funds to Staar even before the invoices were paid. (R. 36-2, PageID# 409, Scott. Depo. at 74). Scott was unsure whether Staar had to pay TAB Bank back for advances on those invoices Reliable never paid. (R. 36-2, PageID# 410, Scott Depo. at 75). Plaintiff maintains the real party in interest in this matter is a non-party, TAB Bank, and that Staar cannot prove that it suffered damages as a result of Reliable's failure to pay the invoices for services rendered.

In a breach of contract action, "the law of damages seeks to place the aggrieved party in the same economic position the aggrieved party would have attained if the contract had been performed." *Endless River Techs. LLC v. Trans Union LLC,* 2023 U.S. Dist. LEXIS 725, at *7 (N.D. Ohio Jan 3, 2023) (citing 11 Corbin on Contracts §55.11 (2022)(citing Restatement (First) of Contracts § 329); *see also* Restatement (Second) of Contracts §347 ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.").

In response to Reliable's rather tenuous argument, Staar has submitted an affidavit from its accounting manager, Crystal Neill, affirming that Staar repaid TAB Bank for all amounts it was advanced in connection with the relevant unpaid invoices. (R. 37-5, PageID# 704, Neill Aff. at ¶¶15-26).

The Court finds unpersuasive the argument that Staar would be unable to prove damages if it shows a Verbal Agreement existed.

## V. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (R. 36) is DENIED.

IT IS SO ORDERED.

/s/*David A. Ruiz*
David A. Ruiz
United States District Judge

Date: October 8, 2025